Good morning, your honor. Good morning. May it please the court, there are four issues that we raised on our appeal. I'll be addressing two of the issues, the issue of access and copyright damages, and my co-counsel, Mr. Phillips, will be addressing the substantial similarity and striking similarity issues. And I wanted to start first by discussing the issue of access in this copyright case. On the issue of access, we are seeking reversal of the district court's finding of no access. Respectfully, we contend that the district court misapplied Fifth Circuit legal standards and failed to consider the summary judgment evidence in light . . . I think, your honor, that is a bare possibility of access if you just say that any time you give your CD to somebody, it might potentially have been received. But I think that the facts in our case have to consider the context of the time period. So how did your clients not receive the Nickelball song that was pretty famous and was around for 13 years before they heard it? Also, I'm sure, being transferred around. Right. How can they claim, oh, Nickelball heard us, but we didn't hear Nickelball? How is that possible? Mr. Johnston, after his band disbanded, was listening to different types of music other than what the sound that Nickelback was making between 2005 and 2018. And the record shows that when he was remastering his music, the individual that he was working with was the first person to say, hey, this sounds like a Nickelback song. And at that point, he started to investigate. He was no longer in the music industry. He didn't have any reason to go back and investigate how his songs were being used. We're not in the music industry, but we've heard songs, right? Right. I'm assuming everybody in this room has heard some song. I'm not saying necessarily this one, but a song. So you don't have to be in the industry to hear a song. In fact, the industry wouldn't be an industry if no one else was listening. Right. Okay. So I'm not understanding that point. The summary judgment evidence did not reflect any countervailing testimony to his statement that he did not hear the song until 2018, until 2017, 2018. Well, of course, you can't prove that he heard it or didn't hear it, but it was pretty famous and out there. So that's why I'm trying to understand how he wouldn't hear it, like, in his car on the radio. Right. Ms. Evett had an opportunity to cross-examine him on that in his deposition, and he testified that he didn't really listen to popular music on the radio, that the type of music that he listened to, the stations were not consistent with the type of music that played Nickelback. He knew who Nickelback was. Nickelback is a famous artist, but he just didn't have any reason to have heard the song until he was remastering his song. Okay. And so then the fact that he's, for 13 years, not listening to anything like that, how does that show that Nickelball necessarily heard his song or was it because he sent out a CD? Not to them, but to... The timeframe is that he produced the song in early 2001, the summer of 2001, and it was widely disseminated through publicity. It was widely disseminated through publicity to relevant members of the music industry. And in that respect, this case is a lot like Peele versus Bud Market Incorporated, in that the relevant players in the music industry had an opportunity to hear his song, and not just hear it, but hear him play it, which was a critical component. In that time period, in the early 2000s, it was critical for musicians to be heard performing their music live. And he performed the song at a famous venue in Los Angeles, for example, the Whiskey A Go-Go, on the same bill as Maroon 5 and a band called Rooney. The front member of Rooney is related to the Francis Ford Coppola family, so even though these bands were unsigned, they had a large following. The summary judgment record shows that record industry executives, including roadrunner executives, regularly attended shows at the Whiskey, and regularly attended shows that Maroon and Rooney performed at. And we have summary judgment evidence that shows that he was on the same... His band, Snowblind, was on the same card as these bands. So it's almost like a prize fight, right? If Mike Tyson is on the card, who's on the undercard matters. They get the same publicity. So there was an opportunity for Nickelback's handlers to have heard the song, a reasonable opportunity to have heard the song when you consider the time frame, the time in which the music was created. Nickelback's song came out in 2005. So there is not... Some of these cases where they show a bare possibility, there's a time problem, right? Like the plaintiff tries to show that the person heard the song maybe a couple of weeks before the new album came out, or a year after the album came out, the infringing work. But there's not a temporal problem here in this case, because it's undisputed that his work was disseminated to members of the music industry in 2001. The infringing song came out in 2005. I think the point that is relevant on the issue of access is, again, I go back to Peel versus Rugged Market Incorporated, where this court reversed summary judgment on the issue of access. The court looked at the type of access evidence, and in that case, which involved rugs, highly specialized decorative rugs, there was an overlap between the presentation of the copyrighted work and the presence of defendants or defendants' handlers at the presentation of the work. For example, the rug was shown at a trade show that Rugged Market was shown to have attended. We know that Nickelback's management group, UEG, regularly attended shows at the Whiskey. We know that Universal Music Group physically received a copy of Mr. Johnson's work before it was performed in New York at the Continental Club. But don't people like that, in those positions of handlers and publishers, routinely get CDs or demos from all over the place? They do. The testimony from Mr. Estrada and Mr. Rath was that they listen to everything, that they consume music. The fact that they listen to it doesn't mean they've got more than one client, each of those companies. The fact that they listen to it makes it possible, but still highly speculative, that they would have said to the Nickelback fellows, oh, this is something you need to hear. There's no evidence of that sort. Unfortunately, that's the bane of most plaintiffs in a copyright infringement case. The evidence, we're not going to be able to connect the dots on factual copying, and that's why the question isn't, have you connected all the dots? The question is, have you shown a reasonable opportunity for the dots to be connected, and let the jury evaluate. The jury evaluate the access evidence with the self-serving denials of the defendant, which is going to happen. I cite the case of Hewitt Custom Home Designing ... Your argument seems to be if you send a CD around, then anybody who ever uses any of the words in your song, you can sue. Well, Your Honor, Mr. ... I'll be talking to him about that, but that's your argument, it sounds like, on access. On access, we have specific individuals who we know attended the shows who were affiliated with the defendants. It was like this, I don't know, intern or somebody at the company. Not ... Mr. Polito, right. Yeah. Mr. Polito, and Mr. Rath testified that he did take song suggestions, he assigned bands on the basis of recommendations from individuals such as interns. In the context of the time period, it was not unreasonable that that would be a way that they would have accessed the music. Okay. Your time is up, you have a chance for rebuttal. Thank you. All right. Ms. Evatt? No, it's Mr. ... Oh, excuse me. Phillips. Mr. Phillips. Thank you, Your Honors. I wanted to make one point also. I'm here to talk about similarity of the two songs. One point that Mr. Kalapadopoulos didn't raise, however, is you had mentioned Roadrunner receiving the CD. As it turns out, Roadrunner was a heavy metal label. Nickelback, who was on their label, was the only hard rock band that was on their label. To the extent that they were interested in this hard rock song for Mr. Johnston, it's clear Nickelback would have been who they passed it on to at that time. It's not just, oh, they've got lots of bands on the label, who would it have been? It would have clearly been Nickelback. Okay. I want to ask you about striking similarity. Sure. What is your best citation of a case that says that two songs that have only a few words that are the same and don't sound alike at all, nonetheless, it's suable? Your Honor, great question. First off, striking similarity for us is not about the lyrics of the song. It really is about the hooks of the song. I know in summary judgment, they led off with the lyrics of the song being completely different. We believe the lyrics of the song are substantially similar. This really comes down to- Well, just rock star, but there's a lot of rock star songs. There are a lot of rock star songs in general. Because there's a lot of rock stars or people who got to be a rock star, right? That's the theme of the song. The theme, I mean, a copyright covers more than just the theme. The copyright covers very specific creative additions to the art. In this case, we believe that the striking similarity is in the hook, hey, hey, going to be a rock star from Nickelback's song. It occurs five times in their song. It's not just the lyrics. It's the melody of the song. That was our musicology expert. How does the melody of their song sound at all like the melody of your client's song? Specifically with the hook, Dr. Mooney and Dr. Ferrara actually go back and forth on this issue. But Dr. Mooney, the musicology expert for Mr. Johnston, specifically identifies eight characteristics of the hook. I've seen the eight characteristics. I don't know. You think baseball and football are the same. I'm guessing a lot of people would disagree with that proposition. I don't agree that baseball and football are the same. Okay. But you said because one talked about baseball and the other talked about football. Again, that's the lyrics of the song, the verses. That's not what we're saying is striking similar. Striking similarity is I'm going to be a rock star someday, and hey, hey, I'm going to be a rock star. Just those two hooks. One is repeated. But going to be one and wanting to be one are two different things, really. I'm sorry? Going to be one and wanting to be one are two very different things. Well, in terms of the lyric, I mean, they both have to do with the future of going to be a rock star, what am I going to do? But that's about the theme of the song. This is what the song is about. The focus of striking similarity is the fact that Nickelback copied essentially note for note on the most important part of the song that's repeated five times in their song, nine times in Mr. Johnston's song. It's the musical elements that we believe are strikingly similar. The melody of the hook. It's not the words of the hook? The words of the hook are similar, but the melody of the hook, if you look at Dr. Mooney's report, Dr. Ferrara's report, that's where the big debate is between the two musicologists. It's the melody of the hook is identical. That's basically the testimony of Dr. Mooney. It's unique, right? Which brings us into the world of striking similarity. Dr. Mooney, who's a PhD musicologist, certainly believes that it's not something that's coincidental that these are like this, right? These eight similarities lumped together, agglomerated together. Yes, notes are all, every note has been played, but playing these notes in this way is unique and it's very telling. The difference between the two, and this is just, I know I'm running out of time, I'll just state this. The difference between the two experts in this case, Dr. Mooney, both experts, the reason why we have musicology experts is to aid the jury, right? Dr. Mooney's opinions all relate to what the jury is going to hear, the sound. These eight characteristics make a unique sound. Dr. Ferrara's critiques of that- You all have criticized the magistrate judge for listening to them and saying they sound different. The magistrate- And if your whole thing is that they sound the same and the magistrate judge says they sound different, why doesn't that matter? Well, first off, it's unclear. She said the songs don't sound the same. She didn't really address the hooks per se, but one of the issues is, and this is one of the big overarching issues of the case as well, the district court, their job at summary judgment isn't to resolve the issues, right? Their job on summary judgment is to identify the issues. There's clearly an issue with regard to similarity in this case. Well, now wait a minute. I had some help from somebody who's a musician, and he says, for instance, Johnson argues that both hooks begin on the third degree of the harmony. The opening note of the hook is a B flat or B sharp in plaintiff, while the nickelback opening hook is a D. Johnson experts says these notes are the thirds of their respective chords, but not only are the melody notes different, the opening chords are different. Finally, both hooks end with a descending third, but the plaintiff's third is a major and the nickelback is a minor. Dr. Mooney actually addressed that in rebuttal. It's actually in the report in the- What's his rebuttal? His rebuttal is that they are equivalent, and that is actually one of the problems with Dr. Ferrara's- Well, all notes are equivalent if you want to- Not exactly, and this is actually a key distinction. Dr. Ferrara breaks down each of the eight characteristics in, oh, this is subtly different, this note is subtly different, as you just pointed out, Your Honor. But that's a lot of difference. But what the here, though, that's the interesting thing. The nine differences identified by Dr. Ferrara, although they may be technically a difference in the notes, when you listen to it, what the jury's going to have to do, which is listen to it, it's a difference without a distinction, to be honest, Your Honor. That was Dr. Mooney's testimony. If I have two different recipes and they both taste the same, you're saying that it doesn't matter that technically the ingredients were different. If what the jury is receiving is that all of these items taste the same, talking about a different sentence, then you have striking similarity because they taste the same? Well, it depends on what the difference is in the ingredients, Your Honor, because the differences that Dr. Ferrara cited are very minor. There'd be the difference between 1.2 ounces of tomato paste versus 1.0 ounces of tomato paste and some other aspect of tomato that ends up tasting the same. We're talking about very minute differences that were identified by Dr. Ferrara. But for purposes of what the trier of fact is going to have to ultimately determine, those differences sound the same. And that's a key difference between the two experts. Dr. Mooney was focused almost entirely on the sound that the jury is going to have to hear, aiding the jury on why that is that these eight similarities sound the same. The nine differences actually don't impact the sound. And so a jury wouldn't even, even though we'll hear that. I get that the nine things that they listed out are technically different. You're just saying that the sound is the same. The sound is the same, which is what's important. But if you played this actual songs, as you hear them in, let's say, if I'm driving my car and I'm listening to the radio and one song comes and then the other, you are saying those are the same? Well, I was listening to the radio. I think I heard the same song twice. That's actually a big part of this as well, right? This is... That's not what the magistrate... We're talking about the two CD versions of the songs with different instrumentation in their different genres. I'm talking about what likely happened in terms of factual copying, is Nickelback hearing a song and using those notes to create their sound. So the comparison we think is appropriate that Dr. Mooney has advocated for is an acoustic version to spread out the unprotectable elements, the instrumentation, how they play guitar, if there was horns, things like that, to actually listen to the vocal melodies of the song. Yes. Listen, apples to apples. Yeah, I believe they're the same. And you hear that by listening to the two acoustic versions where the music is stripped out. Oh, by the way, their acoustic version is accused of infringement as well. So it's actually them playing acoustic at a concert is actually accused of infringement in this case. So it's actually part of this case. It's not just stripping apart the instruments. It's actually accused of infringement as well. But it's the same song. It's the same song because it has the same hook. The different versions of the Nickelback song are the same because they have the same notes. They're actually played the same. Yeah, but some have instruments, some don't, is I guess what we're saying. Mr. Johnson's lyrics, so to put it one way, considerably more spare than the Nickelback ones. The overall lyrics of the song? Yes. Yeah, the overall lyrics of the song we believe are substantially similar. To be honest, there's striking similarity in the hooks. The fact that the lyrics and the lyrical themes are the same, to me and to a lay juror I believe, would show that they actually had the song in front of them. Yes, they created different lyrics slightly, right? Different thematic within the same lyrical thematics. But that's not really the striking similarity analysis, your honors. This is really about the hooks of the song. Although we believe that the lyrics do show, you know, in terms of circumstantial evidence of showing factual copying, clearly show that one song was in front of the other. Okay. We have your argument. Thank you. Yes, sir. Now, Ms. Abbott. Good morning. May it please the court. The district court in this case properly exercised a critical gatekeeping function when it granted defendants motion for summary judgment. Just as in the Fifth Circuit's decisions in Armour v. Knowles and Batiste v. Lewis, the district court here properly found, based on undisputed facts, that one, the creators of defendant's song did not have a reasonable opportunity for access to plaintiff's song. And two, the songs at issue are not strikingly similar. The district court correctly can... What about his contention that if you take out all the, and what you need, and all this other stuff that's floating around in nickel ball and just cubby onto the acoustic, that they're the same? What's your response to that? Your Honor, regardless of what version of the songs the court considers, they're not similar. They're not strikingly similar, and they're not substantially similar. They do not sound alike. The purported similarities that are identified by Dr. Mooney are not similarities. My friend on the other side focused on the eight musical similarities. They are basic building blocks of music. They are present in Nickelback's prior songs. And they are not even truly similarities, just as Judge Jones pointed out, we've got a minor third and a major third. So irrespective of that, in the Guzman case, the court said, you consider the entire songs. And in Williams versus Bridgeport, the court properly considered the deposit copy of each song and not a different version of the songs. So I do believe that the proper version... You're saying if you were in front of the jury, they should play what I would hear on the radio. If I was driving in New Orleans today, and both songs came on one after the other, that's what the jury should hear. Yes, Your Honor. They have a different version. I'm guessing if this went to a jury, both would get played. Your Honor, the magistrate and the district court, which affirmed the magistrate decision, the magistrate in this case properly considered the versions that would be played on the radio, the deposit copies. The magistrate also considered all versions of the songs that were put in the record in reaching the conclusion that the songs were not strikingly similar. So again, we would submit that it doesn't matter which version of the songs the court considers because they're not going to sound strikingly similar or substantially similar. Okay. But I guess they're claiming that's up to the jury to decide, not the magistrate. What is that... I realize that there's things that are so obvious you could never give a reasonable juror could not find this, and those don't go to juries. What is that stopping point between the magistrate judge could find that versus, well, it didn't sound alike to me, but maybe it did to Edith? Right. The standard for striking similarity, Your Honor, is that the only realistic basis for the similarities between the songs is copying, and that's a very high bar. You asked the other side what their best case was on striking similarity. The best case on striking similarity is the Guzman case, and in that case, there were two songs which had a virtually identical 16-word opening. They both started with the same words, which were in Spanish, and I'll read just a little bit. Yo tengo en mi poder unas cartas de amor que tú me las mandaste pidiendo compasión. The same 16 words with just a little bit of plural language were the same in both works, and the court still found that there's no striking similarity, so it's an extremely high bar. And in Batiste, the Fifth Circuit listened to both songs and said there's no way the Similarly, in Armour v. Knoll, the Fifth Circuit listened to the song, said no way the court can find striking similarity. And I believe that because these two songs here are nothing alike, they don't have very similar... So it's a notion of a reasonable juror could find or not find. If that's not the case, then it is okay for the, your argument is it's okay for the magistrate judge to listen to the songs and say, nah. Exactly right, Your Honor. So on striking similarity, again, the songs sound nothing alike. The purported musical similarities that plaintiff expert Dr. Mooney identified in the hook are not true similarities, therefore their combination is irrelevant because they're not true similarities, and they're just not significant. And it cannot be the case that a plaintiff can have an expert come in and opine as to the ultimate conclusion of striking similarity and therefore be able to get to a jury. That would be a very dangerous precedent if a plaintiff were able to get to a jury solely by having an expert opine on the ultimate issue of striking similarity. Now on access, Your Honors, you asked my friend on the other side, what's your best case for the proposition that simply sending a CD to somebody would be access, would be a reasonable opportunity? And the answer is it's not a reasonable opportunity. And that's the Loomis v. Cornish case in the Ninth Circuit, which is 836 F. 3rd, 991. It's also the Armour v. Knowles case, which I think is very similar to the case here, where we're talking about a hypothetical chain of transmittals. It's tortuous, it's hypothetical, it's speculation, it's conjecture. And interestingly, my friend on the other side mentioned that the timing here is really good, because in this case, Mr. Johnston distributed his CD in 2001 and the Nickelback song came out in 2005. But backing up and thinking about that, his theory of the case requires that one of the unrelated individuals at an unrelated record company who received a copy of plaintiff's work back in 2001, they held on to that until 2004, 2005, passed it to Nickelback, and then Nickelback thought, oh, we're going to copy this song three years later, four years later. And it's just not plausible. It's complete speculation. It's complete conjecture. None of the individuals who plaintiff points to has any connection to Nickelback, which is the creator. What about that intern that attended the concert? Well, Your Honor, Eric Polito was an intern at Universal Motown, which is a subsidiary of Universal Music. So we've got Universal Music, the parent company, and you have Universal Motown, the subsidiary. The way that plaintiffs are trying to trace Mr. Polito and connect him to Nickelback is to say, Universal is the parent company of Island Def Jam, which owned a percentage interest in Roadrunner. Now, it's undisputed that there's no real day-to-day relationship between Island Def Jam and Roadrunner, so you have to go from Mr. Polito, who was an intern, a summer intern in the media marketing department, who says he gave a copy of the CD to a colleague who in turn maybe gave it to somebody in A&R, and that's the relevant department, at a different Universal subsidiary, and that makes it all the way back up the chain over down to Island Def Jam, which gave it to Roadrunner. And it makes no sense, because again, it's undisputed that no one at Roadrunner gave Nickelback a copy of plaintiff's work. It's like saying Judge Haynes came to New Orleans where somebody from Los Angeles was here, so she knows everything in Los Angeles. Exactly, Your Honor. Even I don't purport to know everything in Los Angeles, even coming from there. But in any event, it's very tortuous, and this is precisely the type of theory of access that has been consistently rejected. It was rejected in Armour, where there was a very speculative theory that the plaintiff, one of plaintiff's representatives gave a copy of her CD to this person named T-Bone, and T-Bone must have given it to Beyonce, and Beyonce must have listened to it, and that's precisely the kind of tortuous chain of hypothetical transmittals that was rejected. Okay, what would it take to take them past the summary judgment? What's missing that if they had it, you wouldn't have filed the summary judgment or won it? Well, I think there are two things that are missing, and they're both access and striking similarity. The songs sound nothing alike, so that's a very clear reason why they shouldn't survive summary judgment. The songs are also not substantially similar, which is an entirely separate independently sufficient ground. Access, you would want to see something where there was a connection between the plaintiff's work and one of the actual creators, and there's just no such connection here. Another point I want to address briefly is that plaintiff talks about the two performances, the one performance in Los Angeles and the one performance in New York, but this is not evidence of widespread dissemination, and it's not evidence that the song was widely available. These are two performances. We're talking about two performances at relatively small venues. We're not talking about a nationwide tour. We're not talking about someone playing coliseums and stadiums and huge performances, and it just can't be the type of performance that would create a reasonable opportunity for the creators of Nickelback's work to have heard the plaintiff's song. And there's no indication that the Nickelback people attended any concert that Johnston's group did. Correct, Your Honor. It is undisputed that Nickelback did not attend any performance of plaintiff's work. Furthermore, it is undisputed that no representative of Apelles attended either the Continental Club performance or the Whiskey performance. Now, plaintiff tries to point to various speculation and conjecture that people from Roadrunner maybe used to go to the Whiskey or they used to go to the Continental Club or the like, but again, that's just merely speculation and conjecture, and the cases consistently hold that speculation and conjecture is not enough to survive summary judgment. I mean, if there's a concert hall down the street that you go to a lot, it doesn't mean you go to every concert. Correct, Your Honor. A lot of them. Correct, Your Honor. And moreover, Your Honor, that there's a concert hall nearby does not mean that you went to a particular show, saw the band Snowblind, took home a copy of Snowblind's album, and then passed a copy of that album to Nickelback. It's too many leaps of logic. Well, back in 2001, I guess it was harder to just record copies than it is now. I think that's right, Your Honor. Briefly, one more point on striking similarity, and then if I'm happy to answer any other I want to make sure I address all the points from my friends on the other side. Again, on striking similarities, they try to focus on the hooks and these eight purported musical similarities identified by Dr. Mooney, but the similarities are just simply not material. Again, they're common building blocks of music. They're present in numerous Nickelback songs that Nickelback created before Plaintiff wrote his song. So before August of 2001, Nickelback songs had these elements. At least one or two of these are fingerprints of Nickelback style, and they're consistently present in Nickelback's prior songs. The musical elements identified by Dr. Mooney are present in other prior art songs by other bands. Again, we already discussed the major third, minor third, not the same thing. There are other similarities like this. There's the example of Dr. Mooney identified 16th notes followed by an eighth note, but there are different numbers of 16th notes before the eighth notes. Fundamentally, the court is not required to credit Dr. Mooney's ultimate conclusions. The court can listen to these two songs and reach the conclusion that they are not strikingly similar, and the court can look at the actual similarities and purported similarities identified by the expert and understand that the works at issue are not strikingly similar. I see that I have five more minutes, but unless the court has any more questions, I believe I've addressed all the points. I guess we don't. Thank you very much. Thank you, Your Honor. Mr. Potiphar. Thank you, Your Honor. I think the cake analogy is an important one. The recipe analogy is an important one. I love to pronounce names properly. Call it Potiphar. Correct. Yes, Your Honor. Thank you. The recipe analogy, I think, is perfectly appropriate. I mean, the building blocks of any cake are flour, sugar, maybe eggs, maybe a couple of other ingredients, baking soda, baking powder, but how you put them together matters. The sum is greater than the parts. That's why Nickelback has a copyright on its song. That's why Nickelback's song is more popular. The magistrate judge found this to be a sugar cookie and the other one to be a chocolate cookie. How are those the same? They're cookies, but these are all songs. Yes, Your Honor. I mean, there are examples of musicians who reimagined their own work in ways that don't sound the same. The song Somewhere Over the Rainbow comes to mind. The original version that Judy Garland sings is nothing like the version that Israel Kamakawiwo'ole sings. Lady Gaga has a song, Paparazzi, that she sings in different ways that don't even sound like the same song. But, I mean, if every song is the same, then, I mean, you've got to – I mean, the problem is every song is going to have some similarities. They're going to use notes. There's going to be maybe – there's going to be some music. I mean, so the notion that all these differences don't matter, what's your case on that? Well, Your Honor, the – I think the cases in our brief talk about – go all the way back to 1936 where they say what matters are the similarities. The differences aren't what's – that's why we have this – But you can always find a similarity. I mean, even between a classical song and a rock song, they've got a note. There's – you know, I'm not an expert on this, but I've played a piano and it's got notes. Right. And that's what you use when you're playing the piano. Everybody will use that – those notes even if they all play it differently. So I'm struggling with understanding kind of what is that signpost that stops that. Your Honor, and respectfully, I think that's where the jury comes into play because, I mean, all songs can be – all music can be distilled into – Then why aren't you suing every rock star for every song? I'm sorry? Why are you not suing every rock star for every song if it's only up to jurors to decide? Because Dr. Mooney testified as to why we hear the similarities. He testified as a musicologist. He said that – his testimony, which was not subject to Daubert exclusion or anything like that. He's a qualified musicologist. He said, look, when you hear this, when you hear this version of this song and this there's no other explanation other than that one was copied from the other. That's his expert conclusion. Dr. Mooney addressed the Nickelback's argument that some of the similarities he found are fingerprints of their prior work. He did, and what he said was that you might find one or two elements in one song or one or two elements in another song, but you don't find all eight elements in any of the prior Nickelback artwork. Did he dispute that some of the similarities can be found in older work done by Nickelback? Did he dispute that at all? He did not. He disputed that all eight could be found in any particular prior thing, the prior Nickelback song, which is important because, I mean, it's not that they're arguing that Nickelback copied from itself, which is what they would be saying if they said, well, all eight of these. It's not the one note or the second note. It's the combination of how these notes were presented together, and the jury, Your Honor, is entitled to be the person to say, okay, we have an expert who says that these are building blocks and just building blocks, and we have an expert who says the sum is greater than the parts, that when you put these building blocks together in the manner in which they were put together, it makes something unique. It makes something memorable. It makes something that is copyrightable. Isn't, Mr. Kalapapu, isn't the question ultimately substantial similarity? Yes, Your Honor, and I think that's a question that the magistrate did not even get to, and that's one of our points of contention. I think that more than striking similarity, we think the combination of the substantial similarity between the hooks and the lyrical themes lends credence to the access story, if you will. Let me give you sort of an example. Suppose you have a story like Dr. Seuss's The Cat in the Hat, and then you have some children's book about some fictional character who shows up at their house on a bad weather day and proceeds to get them into mischief, and they may balance things on their heads. They may do a few things. Are you suggesting that there could be enough similarity, substantial similarity between the children's book and a short little poem and a longer work of fiction to make that a copyright violation? Because that's what it looks like to me here just on the face of the lyrics. I think that's an excellent example, Your Honor, and as someone who's had young children and has read many Dr. Seuss books, there's a cadence to the way Dr. Seuss books read, right? They're just three-letter, five-letter words frequently, but the cadence to how he communicates his message is consistent across all of his books. And if someone were to take that same theme of a cat or an interloper involving themselves with children on a snow day in the same style that Dr. Seuss tells his stories, then absolutely that would be copyrighted. There would be enough there to be infringement. Even if the other one expanded on the story quite a bit? If the cadence of the storytelling was similar, I think to me the cadence of the storytelling is what makes Dr. Seuss unique and memorable, right? It's the short declarative sentences, short declarative words, the inverting of the words back and forth so that you use the same word in multiple contexts in the same sentence or paragraph or page. And those things, if you broke them down into, well, the word cat is universal in English, of course you're never going to get there. But when you look at, a jury can look at these things holistically in a way that's not just let's break down these parts. So let's look at the sum. Let's look at the sum, and let's look at the sum distilled without all the other noise, without the other instruments, without the other public stuff. Let's look at this and say, does this really sound like it's an original? Does this come from the original, or is this original? And that's what we're asking for the court to do. OK. We have your argument. Thank you, Your Honor. All right. Thank you. Thank you. We will stand at recess for 10 minutes.